OPINION
{¶ 1} Plaintiffs-appellants, Mark Hanni, II, et al., appeal the judgment entered in the Mahoning County Common Pleas Court in favor of defendants-appellees, Scott Tofil, M.D., et al, in a medical malpractice action. Appellants claim that their case should be reversed and remanded for a new trial because their standard of care expert was asked a question that resulted in a prejudicial answer, the court misstated the instruction on proximate cause and the jury's verdict was against the manifest weight of the evidence. For the following reasons, the judgment of the trial court is affirmed and the jury verdict is upheld.
 STATEMENT OF FACTS {¶ 2} On November 19, 1998, thirty-nine year old Melanie Fidram died of a heart attack. She had been to her physician, Dr. Scott Tofil, on October 23, 1998 complaining of chest and back pain. However, she explained that the pain was caused by a work injury when she reached up and lifted a box off a shelf. She stated that taking Motrin provided some relief. Dr. Tofil found that she looked well, her blood pressure was normal, her heart and lungs sounded fine, and she had tenderness in her chest upon pressure. Additionally, her cholesterol had previously tested in the normal range. Thus, he ruled out a cardiac cause and did not order an EKG.
 {¶ 3} The decedent's autopsy showed that her left anterior descending coronary artery had a 95% blockage. It also revealed that she had experienced a series of heart attacks: one approximately six months before her death that left a significant scar, one approximately thirty days before she died and others in between. Thus, it was stipulated that an EKG performed at her final doctor visit would have revealed coronary artery disease.
 {¶ 4} On May 16, 2000, the decedent's four children, Mark Jr., Meghan, Morghan and Max Hanni [appellants] filed a medical malpractice action against Dr. Tofil and his employer, Primary Care Associates of Youngstown, Inc. [appellees]. Appellants alleged that Dr. Tofil breached the standard of care by failing to properly diagnose the decedent and perform an EKG. They opined that Dr. Tofil knew that their mother was at high risk for cardiac problems. They noted that she smoked one pack of cigarettes per day and had diabetes. And, they stated that her family history showed that her father died at age sixty-two due to complications of diabetes or coronary artery disease. They also pointed out that she visited the office nine times in the ten months before her death and visited Dr. Tofil eight times in eight months.
 {¶ 5} A jury trial proceeded on May 27, 2003. Appellants' expert testified that Dr. Tofil breached the standard of care by failing to order an EKG on October 23, 1998. (Tr. at 77-79, 84). He opined that the decedent was at high risk for a cardiac event due to her smoking, family history and diabetes. Appellants also note that blood work done in February and September 1998 showed that the decedent was at high risk for long-term complications from problems including cardiopathy.
 {¶ 6} Appellants read the deposition testimony into the record of an expert retained by the defense, but whom the defense decided not to call. This expert had testified that the decedent had enough risk factors to call for an EKG. However, he also stated that it is not necessarily a deviation from the standard of care to fail to order an EKG. (Tr. at 374).
 {¶ 7} The defense's expert and Dr. Tofil himself testified that Dr. Tofil was justifiably led away from a cardiac diagnosis due to the overall situation including the normal sounding heart and lungs, the normal blood pressure, her age and gender, the tenderness to touch, the benefit of Motrin, the stated cause, her appearance, the absence of nausea and the presence of pain for more than a few hours. The defense's expert opined that the decedent only presented a moderate risk for coronary artery disease. A medical text was presented to confirm this opinion. The defense expert concluded that Dr. Tofil did not breach the standard of care by failing to order an EKG. (Tr. at 292, 296-297, 302-305, 309).
 {¶ 8} The jury returned a verdict in favor of appellees. By way of special interrogatory, they unanimously found that appellants failed to prove by a preponderance of the evidence that Dr. Tofil breached the standard of care by not performing an EKG on October 23, 1998.
 {¶ 9} Appellants filed a motion for a judgment notwithstanding the verdict or a motion for a new trial. The original trial judge was on sick leave so the replacement judge ruled on the motion and found it without merit on December 17, 2003. Upon objection to the fact that the actual trial judge did not rule on the motion, the replacement judge vacated his ruling and held that the case would wait for the original judge's return. When the original judge did not return, the motion was ruled upon by a fellow judge and again denied on November 29, 2004 in a detailed entry. Timely notice of appeal followed.
 ASSIGNMENT OF ERROR NUMBER ONE {¶ 10} Appellants' first assignment of error alleges:
 {¶ 11} "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY ALLOWING DEFENSE COUNSEL TO QUESTION PLAINTIFF'S STANDARD OF CARE EXPERT ABOUT THE FACT THAT HE TESTIFIED IN CASES IN YOUNGSTOWN, OHIO FOR ATTORNEY RICK GOLDBERG."
 {¶ 12} Appellants' expert on the standard of care was Dr. Taylor Cope, a board certified physician in the fields of internal medicine and cardiovascular disease who practices in the Chicago area. On cross-examination, appellees attempted to downplay Dr. Cope's opinion by noting that he holds himself out as a cardiologist and Dr. Tofil does not. Relevant to this assignment of error, the following colloquy then took place:
 {¶ 13} "Q * * * And you're familiar with testifying against doctors in the Youngstown, Ohio area; are you not?
 {¶ 14} "A Yes.
 {¶ 15} "Q In fact, you have testified for Mr. Carlin [appellants' attorney] on a couple of occasions?
 {¶ 16} "A Only this occasion.
 {¶ 17} "Q Matt Fekette?
 {¶ 18} "A Yes.
 {¶ 19} "Q Rick Goldberg?
 {¶ 20} "A Yes.
 {¶ 21} "Q Do you know where Mr. Goldberg is practicing law currently?
 {¶ 22} "A He's not practicing law currently. He is in jail.
 {¶ 23} "Q You have testified against cardiologists in Youngstown?
 {¶ 24} "A Yes." (Tr. 101).
 {¶ 25} Appellants argue that the question about where Attorney Rick Goldberg was currently practicing and the answer it provoked was unfairly prejudicial, inflammatory and misleading. They urge that it unfairly portrayed their main witness as dishonest by association.
 {¶ 26} As they acknowledge, they failed to object to the question or to the answer it generated. Thus, the situation can only be reviewed for plain error, which is a very limited doctrine, especially in civil cases.
 {¶ 27} "In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." Goldfuss v. Davidson (1997),79 Ohio St.3d 116, syllabus.
 {¶ 28} The Court explained that the doctrine shall only be applied in extremely rare circumstances where the error complained of, if left uncorrected, would have a material adverse effect on the character of and public confidence in judicial proceedings. Id. at 121. The Court continued that the public's confidence is rarely upset merely by forcing civil litigants to live with the errors they themselves or the attorney chosen by them committed at trial. Id. at 121-122.
 {¶ 29} Here, the question and answer were fleeting portions of a trial and must be considered in context. Counsel began a proper line of questioning about how often the expert testifies in town. But, asking where a certain attorney, for whom the expert once testified, now practices was not relevant. The real damage here, however, was not so much from the irrelevant question, as it was from the gratuitous answer. That is, appellants' expert did not have to add to his answer that the attorney in question was in jail. We also note that a juror would not necessarily jump to a conclusion that the expert from Chicago is dishonest merely because he has testified in cases in which a currently jailed former attorney was counsel.
 {¶ 30} We acknowledge that appellees' attorney should not have asked this question as it seems to have no purpose other to inflame the jurors. The answer generated is regretful. But, contrary to appellants' contentions, it does not seriously affect the basic fairness, integrity or public reputation of the judicial process and challenge legitimacy of the judicial process itself. Likewise, the situation does not materially affect the character or public confidence in the judicial system. As such, this assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER TWO {¶ 31} Appellants' second assignment of error contends:
 {¶ 32} "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY IMPROPERLY INSTRUCTING THE JURY ON THE ISSUE OF PROXIMATE CAUSE."
 {¶ 33} The jury instructions pertinent to this assignment of error, with underlined emphasis added to all relevant mentions of proximate cause, are as follows:
 {¶ 34} "* * * They further deny that they breached any duties owed to Melanie Fidram as their patient and further deny that Melanie Fidram had suffered any injury or damage as a proximateresult of alleged negligence, breach of duty as claimed by the plaintiffs.
 {¶ 35} "The claim of the plaintiffs and the denial of the defendants therefore define the issues you must decide. Specifically, the issues you're to decide are as follows:
 {¶ 36} "Number 1: Have the plaintiffs proven by a preponderance of the evidence that the defendants were negligent in one or more of the respects claimed against them?
 {¶ 37} "Number 2: If your answer to this first question is `yes' in favor of the plaintiffs, such negligence — was such negligence a proximate cause of the injuries and damages sustained by the plaintiffs, including the death of the plaintiff's decedent — excuse me — as to — yeah, death of plaintiff's decedent as the term proximate cause will be definedfor you in these instructions?
 {¶ 38} "Number 3: If your answer — if your answer — excuse me — `no' to either of the first two questions, you must find for the defendants.
 {¶ 39} "Number 4: However, if you find that the defendants were negligent in one or more of the respects claimed by the plaintiffs, and if you find that such negligence was theproximate cause of the injury and the damage sustained by the plaintiff, what damages have been sustained by the plaintiff by reason of Melanie Fidram's death?
 {¶ 40} "Number 5: If you find that the defendants were negligent in one or more of the respects claimed by the plaintiffs and you find that such negligence was the proximatecause of the injuries sustained by the plaintiffs, what amount of money will fully and fairly compensate the plaintiff and next of kin for damages as you find to have been proven?
 {¶ 41} "General Legal Principles Involving Medical Malpractice. * * * and that the injury complained of was adirect and proximate result of such doing or failure to do one or more of such particular things. (Tr. 9-12).
 {¶ 42} "* * *
 {¶ 43} "Negligence and Proximate Cause. If you find that the defendant was negligent, then you will proceed to decide by the greater weight of the evidence whether such negligence wasthe proximate cause of the plaintiff's injuries and the death, and if so, what is the extent of her damages. Plaintiff must prove the nature and extent of the injuries and that the defendant caused them. On the other hand, you may find for the defendant if the plaintiff failed to prove to you by the greater weight of the evidence that (A) the defendant was negligent; or (B) that the plaintiff was injured; or (C) that the defendant's negligence was the proximate cause of the injuries complained of." (Tr. 15).
 {¶ 44} "Proximate Cause. A party who seeks to recover for injury must prove not only that the other party was negligent, but that such negligence was a proximate cause of the injury. * * *
 {¶ 45} "There may be more than one proximate cause. * * * (Tr. 15-16).
 {¶ 46} "* * *
 {¶ 47} "Remote Cause or Condition. A person is not responsible for injury to another if his negligence is a remote cause and not a proximate cause. * * *." (Tr. 17).
 {¶ 48} Here, appellants state that when they approved the jury instructions numbered four and five above, those instructions properly used the phrase "a proximate cause." However, the trial court ended up stating "the proximate cause" instead. (Tr. 10-11). And, the court repeated its misuse of the phrase "the proximate cause" two times thereafter, when defining proximate cause. (Tr. 15). Appellants conclude that this misreading of the jury charge placed a greater burden on them to show that the alleged negligence was the sole cause of death rather than one of many factors.
 {¶ 49} In response, appellees point out that in the initial instructions prior to the instructions numbered four and five, the court used the phrase "a proximate cause." (Tr. 9-10). Furthermore, the jury answered a special interrogatory presented as part of the verdict form by finding there was no breach of the standard of care. Thus, they never reached the proximate cause issue. As such, any misstatements regarding proximate cause were irrelevant and not prejudicial under the circumstances existing herein.
 {¶ 50} In fact, the court's use of "the proximate cause" in instructions numbers four and five dealt with instructions on damages. (Tr. 10-11). The court had already properly used "a proximate cause" when introducing its instructions and when setting forth the specific instruction regarding the interrogatory on proximate cause. (Tr. 91-0).
 {¶ 51} And, when properly mentioning "a proximate cause" in the specific instruction regarding the proximate cause interrogatory, the court noted that proximate cause would be defined later. (Tr. 10). Thereafter, in defining proximate cause, the court did interchangeably state "the proximate cause" and "a proximate cause." (Tr. 15). However, the court then specifically explained that there may be more than one proximate cause. (Tr. 16).
 {¶ 52} A jury charge must be considered as a whole. Beckerv. Lake Cty. Mem. Hosp. West (1990), 53 Ohio St.3d 202, 208. The reviewing court must determine whether the jury charge probably misled the jury in a matter materially affecting appellant's substantial rights. Id. Here, considering the totality of the charge and the fact that the jury never even had to consider the proximate cause issue, the intermittent use of "the" instead of "a" did not affect appellants' substantial rights.
 {¶ 53} Appellants point out that the Fifth District has ruled that the use of "the" instead of "a" can affect substantial rights because it makes the jury believe that the defendant is not liable unless his negligence was the sole cause. Burgess v.Cramblit (Oct. 22, 1985), 5th Dist. No. CA-8-85. Appellees counter with a case from the Second District, which did not find that use of the word "the" changed the meaning of the charge.Waldron v. Miami Valley Hosp. (1994), 2d Dist. No. 14108.
 {¶ 54} The Burgess case cited by appellants is distinguishable from our case and the Waldron case. TheBurgess court specifically noted: "At no time does the court say that the defendants' negligence must be a proximate cause." Here, the court did say "a proximate cause" multiple times and further explained that there can be more than one proximate cause. This is similar to the facts of the Waldron case. Furthermore, in this case, the jury found no breach of the standard of care, which in turn failed to necessitate an analysis of proximate cause.
 {¶ 55} Moreover, there is no indication that appellants objected to the court's misstatement. As they note, they approved a jury charge using "a proximate cause" in all places, but the court misread the charge as containing "the proximate cause" in certain places. (Apt. Br. at 5). Thus, contrary to their suggestions on appeal, they could not have preserved any objections in chambers prior to the instructions being read to the jury because there was nothing to object to until the misstatement occurred. The only objections that could be preserved for placement on the record after the charge were those discussed prior to the court's reading. (Tr. 30). Appellants failed to point out the court's alleged misstatements at a time when the court could have corrected them. Thus, they waived this error, and plain error is not apparent for the reasons set forth above. See Civ.R. 51(A); Goldfuss, 79 Ohio St.3d 116.
 ASSIGNMENT OF ERROR NUMBER THREE {¶ 56} Appellants' third assignment of error provides:
 {¶ 57} "THE JURY'S VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 58} A judgment shall not be reversed as being against the manifest weight of the evidence if there is some competent and credible evidence going to all the essential elements of the case. C.E. Morris Co. v. Foley Constr. Co. (1978),54 Ohio St.2d 279, 280. In determining this weight of the evidence issue, we are guided by the presumption that the findings of the fact-finder are correct. Seasons Coal Co., Inc. v. City ofCleveland (1984), 10 Ohio St.3d 77, 79-80. This is because the trier-of-fact occupies the best position from which to evaluate the witnesses and observe their demeanor, gestures and voice inflections and to use these observations to weigh the witnesses' credibility. Id. at 80.
 {¶ 59} It is also the fact-finder's primary function to place weights on the various pieces of evidence presented. Id. Where there exists conflicting testimony and where either party's version of the events is a rational explanation, we do not pick and choose among the versions presented. State v. Gore (Feb. 17, 1999), 7th Dist. No. 94CA97. This choice is left to the trier-of-fact. And, in jury trials, a judgment cannot be reversed on weight of the evidence in the absence of a unanimous court. Ohio Const. Art. IV, Sec. 3(B)(3).
 {¶ 60} The decedent was only a thirty-nine year old woman who appeared to be in good health and physically fit. She stated that she hurt her back and chest while reaching for and lifting a box at work. Her injury locations were tender to the touch. Heart attacks are not. Her pain was helped by Motrin, which would not help a heart attack. Her blood pressure was normal. Her heart and lungs sounded good. Her cholesterol levels were known to be in the normal ranges. She was not nauseous. Testimony established that just because she had risk factors such as smoking, diabetes and possible heart disease by her father at age sixty-two (which was disputed by the defense) did not require her family physician to order an EKG upon being presented with the totality of the circumstances herein.
 {¶ 61} Dr. Cope opined that the standard of care was breached. Another expert testified contradictorily that it may have been a breach but was not necessarily so. Dr. Tofil and his expert testified that the standard of care was not breached. The jury chose to believe the defense's presentation and interpretation of the evidence. Such interpretation is rational and is not contrary to the manifest weight of the evidence. This assignment of error is overruled.
 {¶ 62} For the foregoing reasons, the judgment of the trial court is hereby affirmed and the jury's verdict is upheld.
Waite, J., concurs.
DeGenaro, J., concurs.